**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PHILLIP MYERS and DANIEL DUFFY, | : | Civil No. 3:18-CV-00042 |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| CITY OF WILKES-BARRE, PA, *et al.*, | : | |
| | : | |
| Defendants. | : | Judge Jennifer P. Wilson |

## MEMORANDUM

This is a First Amendment retaliation claim brought by two police officers with the Wilkes-Barre, Pennsylvania police department ("WBPD" or "the department"). Plaintiffs, Phillip Myers ("Myers") and Daniel Duffy ("Duffy"), allege that they were subjected to retaliation because of actions they took in their roles as president and vice president of the WBPD branch of the Police Benevolent Association ("the union")—the labor union that represents WBPD officers. The case is before the court on the Defendants' motion for summary judgment. For the reasons that follow, the motion is granted in part and denied in part.

### PROCEDURAL HISTORY

Plaintiffs initiated this case on January 5, 2018 by filing a complaint against the City of Wilkes-Barre ("the city") and individual Defendants Tony George ("George"), Marcella Lendacky ("Lendacky"), and Ronald Foy ("Foy"). (Doc. 1.) The complaint raises a claim for First Amendment retaliation against the individual

1

defendants and a separate municipal liability claim for First Amendment retaliation against the city.  (*Id.* ¶¶ 79–85.)  The individual defendants are sued in both their individual and official capacities.  (*Id.* at 1.)

Defendants filed a motion to dismiss the complaint on February 21, 2018. (Doc. 8.)  United States District Judge Robert D. Mariani granted the motion in part on January 15, 2019.  (Docs. 44–45, 47.)  Judge Mariani dismissed the Plaintiffs' punitive damages claim against the city and dismissed Plaintiffs' official capacity claims against Defendants George and Lendacky, but denied the motion in all other respects.  (Doc. 47.)  Defendants then answered the complaint on February 4, 2019.  (Doc. 49.)

Defendants filed the instant motion for summary judgment on August 26, 2019, along with a supporting brief and a statement of facts as required by Local Rule 56.1.  (Docs. 70–72.)  Plaintiffs filed a statement of facts and a brief in opposition on October 4, 2019, and Defendants filed a reply brief on October 28, 2019.  (Docs. 78–79, 82.)  The case was reassigned to the undersigned pursuant to a verbal order from Chief United States District Judge Christopher C. Conner on November 15, 2019.

Plaintiffs filed a sur reply to the motion for summary judgment on November 20, 2019, alerting the court to a newly issued precedential opinion from the Third Circuit that was potentially relevant to the issues raised in the

Defendants' motion, *Javitz v. Cty. of Luzerne*, 940 F.3d 858 (3d Cir. 2019). (Doc. 83.) The court issued an order on November 25, 2019, accepting the sur reply as properly filed and granting Defendants an opportunity to file an additional brief in response to the sur reply. (Doc. 84.) Defendants filed such a brief on December 4, 2019, making the motion for summary judgment ripe for disposition. (Doc. 85.)

## THE PARTIES' STATEMENTS OF MATERIAL FACTS AND THE COURT'S REVIEW

Under Local Rule 56.1, a party moving for summary judgment is required to submit "a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." The party opposing summary judgment must then file "a separate, short and concise statement of the material facts, responding to the numbered paragraphs" in the movant's motion, "as to which it is contended that there exists a genuine issue to be tried." M.D. Pa. L.R. 56.1.

In this case, both parties have submitted statements of material facts as required by Local Rule 56.1, but, like two ships passing in the night, the statements exist alongside one another, but do not respond to each other in any meaningful sense. (*See* Docs. 72, 79.) Although Defendants point out the deficiencies in the Plaintiffs' statement by requesting that it be stricken for not complying with Local Rule 56.1, *see* Doc. 82 at 2–7, they do not take the extra step of responding to the allegations of fact made in the Plaintiffs' statement. The court

3

is therefore left with two statements of material facts that do not advance the goals of Local Rule 56.1: to facilitate the court's understanding of the facts by indicating which facts are undisputed, and to provide specific evidence supporting each party's position as to the facts that remain in dispute. *See, e.g.*, *Landmesser v. Hazleton Area Sch. Dist.*, 982 F. Supp. 2d 408, 412 (M.D. Pa. 2013) (noting that the statements of material facts required by Local Rule 56.1 "are intended to alert the court to precisely what factual questions are in dispute and point the court to the specific evidence in the record that supports a party's position on each of these questions" (quoting *Rocuba v. Mackrell*, No. 3:10-CV-01465, 2011 WL 6782955, at *4 (M.D. Pa. Dec. 21, 2011))).

Nevertheless, because the complaint and answer provide a sufficient basis for the court to understand the facts of the case, the court will deny the Defendants' request to strike the Plaintiffs' statement and proceed with its consideration of the motion, despite the parties' deficient statements of material facts.

Where a fact is admitted by both sides either in the complaint, answer, or statements of material facts, the court will cite pleadings from both parties and treat the fact as undisputed. Conversely, where a fact is not admitted by both sides, the court will view the fact in the light most favorable to the Plaintiffs as the non-movants and draw all reasonable inferences in their favor. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (citing *Scheidemantle v. Slippery Rock*

*Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)).  In such a situation, the court will generally cite only to the Plaintiffs' pleading that sets forth the disputed fact.  Using that methodology, the court will proceed to the facts of the case.

### FACTUAL BACKGROUND

Plaintiff Myers began working as a police officer for the WBPD in 2002. (Doc. 1 ¶ 5.)  Plaintiff Duffy joined the department in 2014.  (Doc. 1 ¶ 6.)  Myers has been the president of the union at all relevant times, while Duffy became vice president of the union in January 2017.  (Doc. 1 ¶¶ 13–14; Doc. 49 ¶¶ 13–14.)

The facts that give rise to the Plaintiffs' claims began in September or October of 2015, when Defendant George, the former police chief of the WBPD, was running to become mayor of Wilkes-Barre.  (Doc. 1 ¶¶ 8, 20; Doc. 49 ¶¶ 8, 20.)  As part of his campaign, George asked Plaintiff Myers if the union would endorse him.  (Doc. 1 ¶ 20; Doc. 49 ¶ 20.)  Myers declined, informing George that the union did not endorse political candidates.  (Doc. 1 ¶ 21; Doc. 49 ¶ 21.)  The union formally voted not to endorse George on October 9, 2015.  (Doc. 1 ¶ 22.)

Defendant George was elected mayor in November 2015 and took office on January 4, 2016.  (Doc. 1 ¶¶ 23, 25; Doc. 49 ¶¶ 23, 25.)  Within days of George taking office, Plaintiff Myers was removed from his position as community policing sergeant at George's direction.  (Doc. 1 ¶ 26; Doc. 49 ¶ 26; George Dep.

at 98, Doc. 79-4 at 27.) Another high-ranking member of the union testified that the timing of the decision to remove Myers from the community policing sergeant role "seemed suspect." (Roberts Dep. at 67, Doc. 79-74 at 20.)

Later in January 2016, Robert Hughes, the then-chief of the WBPD, announced he was going on leave. (Doc. 1 ¶ 27; Doc. 49 ¶ 27.) Defendant George appointed Defendant Lendacky as interim chief in Hughes's place. (*Id.*)

Prior to Hughes announcing his intention to go on leave, Chris Roberts ("Roberts"), a lieutenant with the WBPD, had reported to Hughes that Defendant Lendacky—who was then serving as a lieutenant—had been altering police reports to reflect lesser crimes than the crimes that had actually been committed. (Doc. 1 ¶ 24; Doc. 49 ¶ 24.) Hughes indicated his intention to investigate the matter. (*Id.*) After Hughes went on leave and Lendacky was appointed interim chief, however, no investigation of the matter was conducted. (Doc. 1 ¶ 28; Doc. 49 ¶ 28.)

In March 2016, Plaintiff Myers drafted a letter to Defendant George with the input of the union's board that sought to prevent Defendant Lendacky from being named chief on a permanent basis. (Doc. 1 ¶ 30.) Myers intended to have the members of the union vote on the letter prior to sending it. (*Id.*) Before the union could vote on the letter, however, George appointed Lendacky chief. (Doc. 1 ¶ 31; Doc. 49 ¶ 31.) The union nonetheless voted to send the letter, and Myers subsequently sent the letter to George. (Doc. 1 ¶ 34.) George received the letter

and discussed the concerns raised in the letter with members of the union several times.  (George Dep. at 130, Doc. 79-4 at 35.)

In the same month, Plaintiffs Myers and Duffy questioned Defendant Lendacky's ability to lead the department in public statements to Wilkes-Barre City Council.  (Lendacky Dep. at 66–67, Doc. 79-27 at 19.)  The statements were made in Myers and Duffy's capacities as president and vice president of the union.  (Doc. 72 ¶ 32; Doc. 78 ¶ 60.)  Lendacky was aware of Myers and Duffy's statements.  (Lendacky Dep. at 66–67, Doc. 79-27 at 19.)  Christopher Benson—an officer in the WBPD who preceded Duffy as vice president of the union—testified that after receiving a copy of Myers's letter to George, Lendacky "declared war on the union."  (Benson Dep. at 63, Doc. 79-47 at 64.)

In July 2016, Defendant Lendacky appointed Defendant Foy to serve as patrol commander in the WBPD.  (Doc. 1 ¶ 36; Doc. 49 ¶ 36.)  In September 2016, Plaintiff Myers and other members of the union had meetings with Defendant George and City Administrator Ted Wampole ("Wampole") to discuss the union's concerns regarding the WBPD.  (Doc. 1 ¶ 37; Doc. 49 ¶ 37.)  The union then conducted a survey of its members about their confidence in the department in either October 2016 or November 2016.  (Doc. 1 ¶ 38; Doc. 49 ¶ 38.)  The survey was organized by Myers.  (Doc. 1 ¶ 38; Doc. 49 ¶ 38.)

Myers, acting in his capacity as president of the union, presented the confidence survey to Wilkes-Barre City Council in December 2016. (Doc. 1 ¶ 39; Doc. 49 ¶ 39; Doc. 72 ¶ 38.) During his presentation, Myers stated his belief that the WBPD was mismanaged, that morale in the department was unacceptably low, and that public safety was suffering as a result of the problems in the department. (Doc. 1 ¶ 40; Doc. 49 ¶ 40.) Myers requested an investigation into Defendant Lendacky's conduct as chief. (*Id.*)

On December 22, 2016, Defendant Foy spoke negatively about Plaintiff Myers during a city council meeting, calling him "dishonest, deceptive, cowardly, untrustworthy and plain wrong." (Lendacky Dep. at 127, Doc. 79-25 at 34; PCPA Report at 1, Doc. 79-5 at 6). The next day, Plaintiff Myers gave Wampole copies of police reports that had been altered by Defendant Lendacky. (Doc. 1 ¶ 41; Doc. 72 ¶ 42.)

Plaintiff Duffy was elected vice president of the union in December 2016. (Doc. 1 ¶ 43.) Shortly after becoming vice president, Duffy complained that many officers in the WBPD had training certificates in First Aid, CPR, and taser use that had expired. (Doc. 1 ¶ 44; Doc. 49 ¶ 44.) Duffy complained that such expired training certificates jeopardized the safety of the officers and the public. (Doc. 1 ¶ 44; Doc. 49 ¶ 44; Doc. 72 ¶ 45.) Duffy made this complaint through multiple emails to Defendant Lendacky. (Doc. 79-87 at 4–8.) Duffy's complaint was made

in his capacity as vice president of the union.  (Doc. 1 ¶ 44; Doc. 72 ¶ 45.)  Shortly after Duffy sent the emails, Defendant Foy told him via email that all such complaints needed to be brought through the WBPD's chain of command.  (Doc. 79-88 at 3.)

In April 2017, Defendant Foy ordered that officers in the WBPD would no longer be allowed to review police reports other than their own.  (Doc. 1 ¶ 52; Doc. 49 ¶ 52.)  Later that month, in response to Foy's order, Plaintiff Duffy authored a series of Facebook posts in collaboration with Plaintiff Myers that he posted on the union's Facebook page that were critical of the department's actions.  (Doc. 1 ¶ 55; Doc. 49 ¶ 55; Doc. 72 ¶¶ 52, 55, 56, 59.)  Plaintiffs also emailed Defendant Lendacky, asking her to rescind Foy's order.  (Doc. 1 ¶ 56; Doc. 49 ¶ 56.)  After receiving the email, Lendacky reportedly said to Christopher Mortensen—a sergeant in the WBPD—"who does Dan Duffy think he is to demand I do something.  Fuck Dan Duffy, it's not going to get done now."  (Mortensen Dep. at 35, Doc. 79-67 at 36.)  Both the emails and the Facebook posts were authored in the Plaintiffs' capacities as president and vice president of the union.  (Doc. 1 ¶ 55; Doc. 72 ¶¶ 49, 55.)

Later in April 2017, Plaintiffs were called for a meeting with Defendant Foy and Commander Joseph Coffay ("Coffay").  (Doc. 1 ¶ 57; Doc. 49 ¶ 57.)  Foy informed the Plaintiffs that he had been ordered by Defendant George to

investigate the Facebook posts. (Doc. 1 ¶ 58; Doc. 49 ¶ 58.) Foy then asked

Plaintiffs who had authored the Facebook posts, but Plaintiffs refused to provide

that information. (Doc. 1 ¶ 59; Doc. 49 ¶ 59.)

In May 2017, Plaintiffs were issued disciplinary charges from the WBPD for

the Facebook posts. (Doc. 1 ¶ 61; Doc. 49 ¶ 61.) Plaintiffs subsequently emailed

Defendant Lendacky, again seeking to have Defendant Foy's order regarding

police reports rescinded. (Doc. 1 ¶ 62; Doc. 49 ¶ 62.) Plaintiff Duffy also emailed

Wampole and Defendant George on September 6, 2017, requesting that they

rescind Foy's order. (Doc. 1 ¶ 63; Doc. 49 ¶ 63.) On that same night and only

hours after Duffy emailed Wampole and George, the city suspended the Plaintiffs

from the WBPD for the Facebook posts. (Doc. 1 ¶ 64; Doc. 49 ¶ 64.)

On September 7, 2017, Coffay ordered that WBPD officers would again be

allowed to review other officers' police reports. (Doc. 1 ¶ 65.) On September 16,

2017, Plaintiff Duffy, acting in his capacity as vice president of the union, emailed

Wampole and Defendant George regarding Defendant Foy's conduct. (Doc. 1 ¶

68; Doc. 49 ¶ 68; Doc. 72 ¶¶ 72–73.) Duffy's email was interpreted as a threat to

George, which resulted in Duffy receiving a disciplinary notice regarding the

email. (Doc. 1 ¶¶ 69–70; Doc. 49 ¶¶ 69–70.)

On October 18, 2017, Plaintiff Duffy was terminated from the WBPD

because of the perceived threat he had made to Defendant George. (Doc. 1 ¶ 73; ¶

Doc. 49 ¶ 73.)  Around the same time, Myers was suspended without pay for the Facebook post.  (Doc. 1 ¶ 74; Doc. 49 ¶ 74.)  Beth Gilbert—a member of Wilkes-Barre City Council who had observed several of the interactions at issue in the case—testified she thought Duffy's termination and Myers's suspension were done in retaliation for their union activities.  (Gilbert Dep. at 57–58, Doc. 79-68 at 16–17.)  Duffy was subsequently reinstated to his position with the department on October 16, 2018.  (Doc. 79-93 at 3.)

While these events were ongoing, Wilkes-Barre City Council retained the Pennsylvania Chiefs of Police Association ("PCPA") to investigate the department. (PCPA Report at 1, Doc. 79-5 at 6.)  The PCPA issued a report about the department on March 30, 2018.  (*Id.*)  The report noted that 15 of the 18 disciplinary actions filed by the department during the period relevant to the report were against members of the union's executive board.  (*Id.* at 2, 7.)  The report also noted that both Lendacky and Foy failed to meet common qualification standards for their positions.  (*Id.*)  The report concluded that "the relationship between the Department administration, specifically Chief Lendacky and Commander Foy, and most members represented by the PBA is irreparably damaged."  (*Id.*)

This court has jurisdiction under 28 U.S.C. § 1331, which allows a district court to exercise subject matter jurisdiction in civil cases arising under the Constitution, laws, or treaties of the United States.

## STANDARD OF REVIEW

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is material if resolution of the dispute "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not precluded by "[f]actual disputes that are irrelevant or unnecessary." *Id.* "'A dispute is genuine if a reasonable trier-of-fact could find in favor of the nonmovant' and 'material if it could affect the outcome of the case.'" *Thomas v. Tice*, 943 F.3d 145, 149 (3d Cir. 2019) (quoting *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012)).

In reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Jutrowski*, 904 F.3d at 288 (citing *Scheidemantle*, 470 F.3d at 538). The court may not "weigh the evidence" or "determine the truth

of the matter." *Anderson*, 477 U.S. at 249.  Instead, the court's role in reviewing the facts of the case is "to determine whether there is a genuine issue for trial." *Id.*

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  The non-moving party must then oppose the motion, and in doing so "'may not rest upon the mere allegations or denials of [its] pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue for trial.  Bare assertions, conclusory allegations, or suspicions will not suffice.'" *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

Summary judgment is appropriate where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.  "Where the record taken as a whole could not lead a rational trier of fact to find for the

non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**DISCUSSION**

Plaintiffs' claims in this case are based on a theory of retaliation under the First Amendment. To establish First Amendment retaliation, "a plaintiff must prove that (1) he engaged in constitutionally protected conduct, (2) the defendant engaged in retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link existed between the constitutionally protected conduct and the retaliatory action." *Javitz*, 940 F.3d at 863 (quoting *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019)).

Defendants argue that Plaintiffs' claims fail because they did not engage in speech or conduct that is protected by the First Amendment. (Doc. 71 at 20–25, 38–39.) Defendants further argue that even if Plaintiffs did engage in protected speech or conduct, Plaintiffs still cannot establish a causal link between that speech or conduct and any retaliatory actions by Defendants. (*Id.* at 25–34.) Finally, Defendants argue that the Plaintiffs' claim for municipal liability against the city fails because the Plaintiffs' complaints were directed at Lendacky and Foy, neither one of whom is a policy-making official, and because Plaintiffs cannot establish the existence of a policy or custom that violated their rights. (*Id.* at 41–42.)

### A. Plaintiffs Engaged in Constitutionally Protected Conduct

The court will first analyze Defendants' argument that Plaintiffs did not engage in constitutionally protected conduct. Ultimately, the court concludes that Plaintiffs engaged in constitutionally protected conduct both through their speech and through their association with the union. The court will analyze Plaintiffs' speech first before moving on to their association with the union.

The analysis of whether an individual's speech is protected changes when the individual is a government employee. *Fulton v. City of Philadelphia*, 922 F.3d 140, 161–62 (3d Cir. 2019). A government employee's speech "is only protected if it occurred in his or her capacity as a citizen rather than as a public employee." *Id.* at 162 (citing *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)). To establish that his speech is protected, a government employee must prove that "(1) the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have an adequate justification for treating the employee differently from any other member of the general public." *Palardy v. Twp. of Millburn*, 906 F.3d 76, 81 (3d Cir. 2018) (quoting *Hill v. Borough of Kutztown*, 455 F.3d 225, 241–42 (3d Cir. 2006)).

### 1. Plaintiffs Spoke as Citizens When They Spoke in Their Union Roles

The question of whether speech occurs in an individual's capacity as a public employee "is a mixed question of fact and law." *Flora v. Cty. of Luzerne*,

776 F.3d 169, 175 (3d Cir. 2015) (quoting *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 988 (3d Cir. 2014)). "Specifically, the scope and content of a plaintiff's job responsibilities is a question of fact, but the ultimate constitutional significance of those facts is a question of law." *Id.* (citing *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1058 (9th Cir. 2013)).

Plaintiffs in this case are police officers with the WBPD. (Doc. 1 ¶¶ 5–6.) As police officers, their job duties include responding to emergency calls, patrolling streets, conducting investigations, and protecting and serving the community. (Doc. 72 ¶ 2.) Although both Myers and Duffy are members of the union by virtue of their roles as officers with the WBPD, Doc. 72 ¶¶ 4, 13, their roles as president and vice president were earned through union elections and did not flow naturally from their roles as police officers. (*See id.* ¶¶ 5, 12.)

A public employee's speech "is only protected if it occurred in his or her capacity as a citizen rather than as a public employee," *Fulton*, 922 F.3d at 62 (citing *Garcetti*, 547 U.S. at 421), but "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Javitz*, 940 F.3d at 864 (quoting *Lane v. Franks*, 573 U.S. 228, 240 (2014)). The "critical question" in determining whether speech occurs in an individual's capacity as a public employee "is 'whether the speech at issue is itself ordinarily within the

scope of an employee's duties, not whether it merely concerns those duties.'" *Id.*
(quoting *Lane*, 573 U.S. at 240).

Although there is no set formula for determining when an individual's
speech is within the scope of his duties as a public employee, the court's analysis is
guided by numerous Supreme Court and Third Circuit cases that have considered
the question. The courts have generally determined that speech is within the scope
of an employee's duties when the employee is required to engage in the speech as
part of his job. For example, in *Bradley v. West Chester Univ. of Pa. State Sys. of
Higher Educ.*, the Third Circuit determined that the director of budget and
financial planning at a public university was acting within the scope of her duties
when she raised concerns regarding the university's budget because her job duties
included reviewing and recommending changes to the university's budget. 880
F.3d 643, 652 (3d Cir. 2018).

The Supreme Court reached a similar conclusion in *Garcetti*, where the
Court held that a district attorney acted within the scope of his duties when he
wrote a memo questioning a search warrant application because writing the memo
was "part of what he . . . was employed to do." 547 U.S. at 421–22; *see also
Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 244 (3d Cir.
2016) (holding that police officers acted within the scope of their duties when they
complained about a departmental policy through the filing of internal police

counseling forms because the officers were required to complete the forms as part of the police disciplinary process); *Gorum v. Sessoms*, 561 F.3d 179 (3d Cir. 2009) (holding that professor acted within the scope of his duties when he opposed the appointment of university president, advised a student, and disinvited university president from speaking engagement, because all of those actions were pursuant to his duties as a professor); *Foraker v. Chaffinch*, 501 F.3d 231 (3d Cir. 2007) (holding that instructors in Delaware State Police's firearms training unit acted within the scope of their duties when they reported problems with one of the unit's firing ranges because "[r]eporting problems at the firing range was among the tasks [they] were paid to perform"), *abrogated on other grounds*, *Borough of Duryea v. Guarnieri*, 564 U.S. 379 (2011).

Where, on the other hand, the speech is related to the individual's job duties but is not required as part of the job, the courts have generally determined that the speech is not within the scope of the individual's duties. For example, in *Javitz*, a county's director of human resources was allegedly illegally wiretapped during a conversation with a local union representative and subsequently reported the wiretapping to high-ranking county officials. 940 F.3d at 861. The Third Circuit acknowledged that the director was only able to report the wiretapping because of her job and that she learned about the information while performing her job, but

held that she was not acting within the scope of her duties because reporting crimes was not within her ordinary job duties. *Id.* at 866.

Similarly, in *Flora*, the chief public defender for Luzerne County, Pennsylvania alleged the county had retaliated against him because he brought a mandamus action against the county to secure adequate funding for the public defender's office and because he reported the county's failure to complete its court-ordered expungement duties arising from the so-called "Kids for Cash" scandal that occurred in the county between 2003 and 2008. 776 F.3d at 173. The district court dismissed the case, finding the public defender was acting within the scope of his duties because his speech related to his job. *Id.* at 174. The Third Circuit reversed, holding that the relevant question was not whether the speech concerned or related to his job, but rather whether the speech was included within his "ordinary job duties." *Id.* at 179; *see also, e.g.*, *Lane*, 573 U.S. at 241 (holding employee was not acting within the scope of his duties when he testified in criminal proceedings about information related to his job because "[t]ruthful testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen . . . even when the testimony relates to his public employment or concerns information learned during that employment"); *Dougherty*, 772 F.3d at 988 (holding former employee of School District of Philadelphia was not acting within the scope of his duties when he told newspaper

about superintendent's alleged misconduct in steering a contract to a specific contractor because reporting misconduct was not part of his normal job responsibilities).

The court has addressed the question of whether Plaintiffs' speech is protected once before in this case. In analyzing Defendants' motion to dismiss, Judge Mariani noted that speech in a union capacity did not constitute speech as a citizen and accordingly concluded that Plaintiffs had not adequately pleaded that their speech was protected because most of their speech was made in their official roles as either police officers or union officers. (Doc. 44 at 17–18.) Nevertheless, Judge Mariani held that Plaintiffs adequately alleged protected conduct because the complaint alleged several instances in which it was "not evident that one or both of them were acting within their official duties as union officials or police officers." (*Id.* at 19.) Defendants urge the court to follow Judge Mariani's conclusion and decide that speech in a union capacity constitutes part of an employee's official duties. (Doc. 71 at 21–22.) Plaintiffs argue the court should reach the opposite conclusion: that speech in a union capacity constitutes protected individual speech. (Doc. 79 at 25–27.)

Because Judge Mariani ultimately held that Plaintiffs adequately pleaded protected speech, his conclusion that speech in a union capacity is not protected constitutes dicta. Even if the conclusion constitutes law of the case, however, this

court nonetheless reaches the opposite conclusion. *See Roberts v. Ferman*, 826 F.3d 117, 126 (3d Cir. 2016) (noting that a district court may reconsider a prior order constituting law of the case so long as the court explains the reconsideration on the record and takes "appropriate steps so that the parties are not prejudiced by reliance on the prior ruling." (citing *Williams v. Runyon*, 130 F.3d 568, 573 (3d Cir. 1997))). Specifically, the court finds that the Third Circuit's reasoning in *Palardy*, 906 F.3d at 83, leads to the conclusion that Plaintiffs engaged in protected speech when they spoke in their roles as president and vice president of the union.[1]

In *Palardy*, the Third Circuit considered a retaliation claim brought by a retired township police officer who had previously served as president of his union. *Id.* at 79. The retaliation claim arose from actions by the township's business administrator, Timothy Gordon, who allegedly prevented Palardy from becoming the township's chief of police because of his opposition to Palardy's union activity. *Id.* at 78–79. The district court granted the defendants' motion for summary judgment, finding that Palardy had not engaged in conduct protected by the First Amendment. *Id.* at 80.

---

[1] Because briefing on the motion to dismiss concluded on May 4, 2018, *see* Docs. 10, 13, 16, and the *Palardy* decision was issued on September 28, 2018, Judge Mariani did not have the benefit of briefing on the issue of how *Palardy* would affect the freedom of speech analysis. With the benefit of *Palardy* and more complete briefing, this court finds that a different conclusion is warranted.

On appeal, the Third Circuit noted that freedom of speech and freedom of association claims should be analyzed separately when a plaintiff pleads a freedom of association claim that is independent of his freedom of speech claim. *Id.* at 81. The court held that with respect to freedom of association claims, a plaintiff does not need to establish that his association pertains to a matter of public concern or that it is not part of his official duties. *Id.* at 83. In reaching the latter holding, the court noted "it is hard to imagine a situation where a public employee's membership in a union would be one of his 'official duties.'" *Id.* The court accordingly remanded to the district court for further proceedings on the plaintiff's freedom of association claim. *Id.* at 84. The court then affirmed summary judgment as to the plaintiff's freedom of speech claim, finding that the plaintiff's claims should have been analyzed exclusively as freedom of association claims because the plaintiff "[did] not allege that Gordon retaliated against him because of his speech or advocacy on any particular issue" but rather solely "because he was a union man." *Id.*

Although the *Palardy* holding was limited to the freedom of association context, the court finds it instructive for determining whether the Plaintiffs' speech was protected in the present case. As discussed above, speech is generally considered to be within the scope of an employee's official duties when the employee is required to engage in the speech as part of his job. *See, e.g.*, *Garcetti*,

547 U.S. at 421–22; *Bradley*, 880 F.3d at 652.  In *Palardy*, the Third Circuit noted

it is "hard to imagine a situation where a public employee's membership in a union

would be one of his 'official duties.'"  906 F.3d at 83.  Following on the Third

Circuit's discussion, it is equally hard to imagine a situation where a public

employee's speech in his role as either the president or vice president of a union

could be considered part of his official duties.  Treating such speech as part of the

government employee's official duties post-*Palardy* appears untenable.  Therefore,

on the facts of this case, the court concludes that Plaintiffs spoke as citizens when

they engaged in speech in their capacities as president and vice president of the

union.

### 2. Plaintiffs' Speech Involved Matters of Public Concern

The second inquiry the court must perform in determining whether

Plaintiffs' speech is protected is whether the speech involved a matter of public

concern.  *Id.* at 81.  "Speech involves matters of public concern 'when it can be

fairly considered as relating to any matter of political, social, or other concern to

the community, or when it is a subject of legitimate news interest; that is, a subject

of general interest and of value and concern to the public.'"  *Lane*, 573 U.S. at 241

(quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)).

In this case, Plaintiffs' speech was about alleged misconduct by Defendants

Lendacky and Foy in their management of the WBPD.  (*See* Doc. 1 ¶¶ 3–34, 40,

55–56.)  Speech relating to misconduct by government officials clearly involves matters of public concern.  *See, e.g.*, *id.* at 241 (stating that "corruption in a public program and misuse of state funds . . . obviously involves a matter of significant public concern"); *Garcetti*, 547 U.S. at 425 ("Exposing governmental inefficiency and misconduct is a matter of considerable significance.").  Accordingly, the court concludes that Plaintiffs' speech involved matters of public concern.

### 3.  Defendants Did Not Have an Adequate Justification for Treating Employees Differently from Members of the Public

The third inquiry the court must perform in determining whether Plaintiffs' speech is protected is whether Defendants had an adequate justification for treating the Plaintiffs differently "from any other member of the general public."  *Palardy*, 906 F.3d at 81 (quoting *Hill*, 455 F.3d at 241–42.)  This requires a balancing of the Plaintiffs' interest in "commenting upon matters of public concern" against the government's interest in "promoting the efficiency of the public services it performs through its employees."  *Pickering v. Bd. of Educ. Of Twp. High Sch. Dist. 205, Will Cty., Ill.*, 391 U.S. 563, 569 (1968).  In balancing these interests, the court must consider whether the speech "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the employee's duties or interferes with the regular operation of the enterprise."  *Baloga*, 927 F.3d at 756 (quoting *Baldassare v. State of New*

24

*Jersey*, 250 F.3d 188, 198 (3d Cir. 2001)).  Analysis of these factors is "fact-intensive," and no single factor is dispositive.  *Id.* (quoting *Miller v. Clinton County*, 544 F.3d 542, 548 (3d Cir. 2008)).  In addition, although the analysis requires a fact-intensive review, the question of whether an employer had an adequate justification for treating an employee differently from any other member of the general public is a question of law that must be determined by the court.  *Green v. Phila. Housing Auth.*, 105 F.3d 882, 885 (3d Cir. 1997) (citing *Waters v. Churchill*, 511 U.S. 661, 667–69 (1997)).

Although "government employers often have legitimate 'interests in the effective and efficient fulfillment of their responsibilities to the public, including promoting efficiency and integrity in the discharge of official duties, and maintaining proper discipline in public service . . . a stronger showing of government interests may be necessary if the employee's speech more substantially involves matters of public concern."  *Lane*, 573 U.S. at 242 (quoting *Connick v. Myers*, 461 U.S 138, 150–52 (1983)).  This is especially true where the speech involves "government impropriety" because such speech "occupies the highest rung of First Amendment protection."  *Swineford v. Snyder Cty. Pa.*, 15 F.3d 1258, 1274 (3d Cir. 1994).  Where speech involves government impropriety, the government bears "a truly heavy burden" to show that its interests outweigh the employees' interests.  *McGreevy v. Stroup*, 413 F.3d 359, 365 (3d Cir. 2005).

In this case, Defendants urge the court to find that the government's interests outweigh the Plaintiffs' free speech interests because "Plaintiffs' Facebook posts and other public criticisms of the City's Administration and administrative directives of their superior officers would and have unjustifiably jeopardized the order, discipline and functioning of the Department." (Doc. 71 at 36.) In support, Defendants cite Paragraphs 60–69 of their statement of material facts. (*Id.*) Paragraphs 60–67 restate various WBPD policies and procedures and indicate that Plaintiff Duffy was aware of those policies and procedures. (*See* Doc. 72 ¶¶ 60–67.) Paragraphs 68–69 relate to deposition testimony from Dane Merryman, the former executive director of the Pennsylvania Chiefs of Police, who testified that it would be improper for a police officer to publicly discuss his superior's policies and that the Plaintiffs' Facebook posts were "very ill advised." (*Id.* ¶¶ 68–69.) Because this evidence does not show any disruption to the order, discipline, or function of the WBPD, the court concludes that Defendants have failed to meet their "truly heavy burden" of demonstrating that the government's interests outweigh the Plaintiffs' free speech rights. *McGreevy*, 413 F.3d at 365. The court accordingly finds the Defendants did not have an adequate justification for treating Plaintiffs differently from members of the public.

Therefore, because Plaintiffs spoke as citizens, their speech involved matters of public concern, and the Defendants did not have an adequate justification for

treating Plaintiffs differently from the general public, the court concludes that Plaintiffs' have engaged in protected speech under the First Amendment.

### 4. Plaintiffs Engaged in Constitutionally Protected Association with the Union

In addition to finding that the Plaintiffs engaged in speech protected by the First Amendment, the court also finds that the Plaintiffs engaged in association protected by the First Amendment by being members of the union.

An employee's First Amendment right to freedom of association protects his right to associate with a union. *Palardy*, 906 F.3d at 84 (citing *Smith v. Ark. State Highway Emps., Local 1315*, 441 U.S. 463, 465 (1979)). Where a retaliation claim is predicated on a plaintiff's freedom of association to join a labor union, the employee is not required to prove that the association is on a matter of public concern because "membership in a public union is always a matter of public concern." *Id.* at 83 (citing *Boddie v. City of Columbus, Miss.*, 989 F.2d 745, 750 (5th Cir. 1993)). Similarly, a plaintiff does not have to prove that the association was done as a private citizen. *Id.*

Although the First Amendment protects the right to associate with a union, a retaliation claim predicated on the freedom of association should be dismissed when it is coextensive with the plaintiff's freedom of speech claim. *Id.* at 81. A freedom of association claim is subject to a different analysis, however, when it is independent and distinct from the freedom of speech claim. *Id.* at 84.

Here, the court concludes that Plaintiffs' freedom of association claim is separate and distinct from their freedom of speech claim. Like the plaintiff in *Palardy*, Plaintiffs are union members and have brought forth evidence that the Defendants "harbored animosity" towards them because of their union membership. (*See, e.g.*, Doc. 79-5 at 2, 7; Doc. 79-47 at 64; Doc. 79-68 at 16–17.) Accordingly, because the First Amendment protects the freedom to associate with a union and because the Plaintiffs' freedom of association claim is separate and distinct from their freedom of speech claim, the court concludes that Plaintiffs' membership in the union amounts to constitutionally protected conduct under the First Amendment.

## B. Plaintiffs Have Produced Sufficient Evidence of Retaliatory Action to Survive Summary Judgment

Because Plaintiffs engaged in constitutionally protected conduct both through their speech and their association with the union, the analysis proceeds to the second necessary element for a First Amendment retaliation claim: whether Defendants "engaged in retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights." *Javitz*, 940 F.3d at 863. The threshold for whether a retaliatory action would deter a person of ordinary firmness from exercising his constitutional right is "very low." *Baloga*, 927 F.3d at 758 (quoting *O'Connor v. City of Newark*, 440 F.3d 125, 128 (3d Cir. 2006)). So long

as a plaintiff can establish more than de minimis retaliatory actions, the threshold

is met. *Id.* (quoting *O'Connor*, 440 F.3d at 128).

In this case, Plaintiffs have produced sufficient evidence for a reasonable

factfinder to conclude that Defendants took retaliatory action against the Plaintiffs.

Specifically, Myers was removed from his position as community policing

sergeant with the WBPD shortly after Defendant George was elected mayor, both

Plaintiffs were issued disciplinary notices and subsequently suspended from the

WBPD, and Duffy was terminated from the WBPD. (Doc. 1 ¶¶ 26, 61, 64, 73;

Doc. 49 ¶¶ 26, 61, 64, 73.) Accordingly, the analysis proceeds to the question of

whether a causal link exists between the Plaintiffs' protected conducted and the

Defendants' retaliation. *Javitz*, 940 F.3d at 863.

### C. Plaintiffs Have Produced Sufficient Evidence of Causation to Survive Summary Judgment

To establish the causal connection necessary for a First Amendment

retaliation claim, a plaintiff must prove his protected conduct was a "'substantial'

or 'motivating factor' in the allegedly retaliatory conduct." *Baloga*, 927 F.3d at

759 (quoting *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000)). The plaintiff

does this by showing either "(1) an unusually suggestive temporal proximity

between the protected activity and the allegedly retaliatory action, or (2) a pattern

of antagonism coupled with timing to establish a causal link." *Id.* (quoting *Lauren

W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)).

In this case, Plaintiffs have produced sufficient evidence for a reasonable factfinder to conclude that there was a causal connection between their protected activity and Defendants' retaliation. To begin with, although Defendants deny that there was a causal connection linking the allegedly retaliatory conduct to much of Plaintiffs' speech, *see* Doc. 71 at 25–28, they acknowledge that the Plaintiffs were disciplined because of their Facebook posts. (*Id.* at 28–29.) Therefore, because there was a causal connection between the Plaintiffs' posts on the union Facebook page—which, as previously discussed, were constitutionally protected speech— and Defendants' allegedly retaliatory conduct, there is sufficient evidence for a reasonable factfinder to find causation.

Moreover, Plaintiffs have produced sufficient evidence to establish a causal connection because they have produced evidence of a pattern of antagonism coupled with a temporal connection between the protected activity and the retaliation. First, with regard to the pattern of antagonism, record evidence shows that Defendant Foy called Plaintiff Myers "dishonest, deceptive, cowardly, untrustworthy and just plain wrong." (Doc. 79-25 at 34; Doc. 79-5 at 6.) Record evidence also shows Defendant Lendacky responding to a request from Plaintiff Duffy by saying "who does Dan Duffy think he is to demand I do something. Fuck Dan Duffy, it's not going to get done now." (Doc. 79-7 at 36.) In addition to those comments, the PCPA's report noted that 15 of the 18 disciplinary actions filed by

the WBPD during the relevant period were against members of the union's executive board. (Doc. 79-5 at 7.) The report also concluded that the relationship between Lendacky and Foy and the union was irreparably damaged. (*Id.*)

As for the temporal connection between the Plaintiffs' protected conduct and the Defendants' retaliation, record evidence shows that the allegedly retaliatory action against the Plaintiffs began shortly after Defendant George assumed his role as mayor. (Doc. 1 ¶ 26; Doc. 49 ¶ 26; Doc. 79-4 at 27.) In addition, Plaintiff Duffy's termination and Plaintiff Myers's suspension both followed shortly after the Plaintiffs' Facebook posts and Duffy's email to George and Wampole. (Doc. 1 ¶¶ 73–74; Doc. 49 ¶¶ 73–74.)

The court accordingly concludes that Plaintiffs' First Amendment retaliation claim survives summary judgment because Plaintiffs have produced sufficient evidence to show that (1) they engaged in constitutionally protected conduct, (2) Defendants took retaliatory action against the Plaintiffs that was sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) there was a causal connection between the Plaintiffs' constitutionally protected conduct and the Defendants' retaliatory actions. With that in mind, the court turns to the final issue: whether Plaintiffs' municipal liability claim against the city survives summary judgment.

**D. The City Is Entitled to Summary Judgment**

Local governments may not be held vicariously liable for their employees'
actions under 42 U.S.C. § 1983. *Connick v. Thompson*, 563 U.S. 51, 60 (2011)
(citing *Monell v. Dep't of Soc. Servs. Of City of New York*, 436 U.S. 658, 691
(1978)). Instead, a local government may only be held liable if the action that
injured the plaintiff was "pursuant to official municipal policy." *Id.* (quoting
*Monell*, 436 U.S. at 691). "Official municipal policy includes the decisions of a
government's lawmakers, the acts of its policymaking officials, and practices so
persistent and widespread as to practically have the force of law." *Id.* (quoting
*Monell*, 436 U.S. at 691). To state a claim for relief against a local government, a
plaintiff "must identify a custom or policy, and specify what exactly the custom or
policy was." *McTernan v. City of York, Pa.*, 564 F.3d 636, 658 (3d Cir. 2009)
(citing *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008)).

Defendants argue the city is entitled to summary judgment on Plaintiffs'
municipal liability claim because Defendants Lendacky and Foy were not
policymaking officials and because Plaintiffs cannot establish that the city had a
policy or custom that led to the violation of Plaintiffs' rights. (Doc. 71 at 41–42.)
In response, Plaintiffs rely on the Supreme Court's holding in *Pembaur v. City of
Cincinnati* that "municipal liability may be imposed for a single decision by
municipal policymakers under appropriate circumstances." *Pembaur v. City of*

*Cincinnati*, 475 U.S. 469, 480 (1986).  Plaintiffs argue that under *Pembaur*, the

city had a policy that harmed their rights because

> George created policy for the WBPD, as did Lendacky when it came to
> officer assignments and discipline under 30 days.  George personally
> removed Myers from the community policing division, personally
> ordered the investigation into the Facebook posts, and personally
> terminated Duffy.  He also inexplicably emailed a reporter articles
> about lawsuits previously involving Duffy and Myers.

(Doc. 79 at 40–41.)

The court concludes that the city is entitled to summary judgment because

the Plaintiffs' complaint did not "identify a custom or policy" or "specify what

exactly the custom or policy was."  *McTernan*, 564 F.3d at 658.  Although the

complaint states that the city "developed and maintained a number of deficient

policies and/or customs which caused the deprivation of Plaintiff's [sic]

constitutional rights" and that the policies and customs "encouraged the individual

defendants and other employees and officials of the City of Wilkes-Barre to

believe that they could violate the constitutional rights of Plaintiffs with impunity

and with the explicit or tacit approval of the Defendant City of Wilkes-Barre," *see*

Doc. 1 ¶¶ 84–85, the complaint does not contain any factual allegations as to what

those policies and customs actually were.  Plaintiffs' argument that George and

Lendacky's actions established a policy fails because those actions were not

alleged as the basis for a municipal policy in the Plaintiffs' complaint.  (*See*

*generally* Doc. 1.)

Moreover, even assuming that Plaintiffs had adequately alleged the existence of a policy or custom in their complaint, their reliance on *Pembaur* is misplaced. Although it is true under *Pembaur* that a single action may establish the existence of municipal policy in appropriate circumstances, 475 U.S. at 480, Plaintiffs' argument is foreclosed by the Supreme Court's later decision in *City of St. Louis v. Praprotnik*, 485 U.S. 112, 128–29 (1988), which more precisely defined the circumstances in which a single action can establish municipal policy.

In *Praprotnik*, an architect who worked for the city of St. Louis was suspended for fifteen days for violating a city policy on accepting outside clients. *Id.* at 114–15. The architect appealed the suspension to the city's Civil Service Commission, which reversed the suspension. *Id.* at 115. The architect's immediate supervisors, allegedly angered by the suspension being overturned, began retaliating against the architect, which culminated in his termination some years later. *Id.* at 115–16. The architect filed a retaliation suit against the individual defendants and against the city for municipal liability. *Id.* at 116. On appeal, the Supreme Court held that the city could not be held liable because the architect "d[id] not contend that anyone in city government ever promulgated, or even articulated" an unconstitutional municipal policy. *Id.* at 128. Thus, although a municipal liability claim can be based on a single action by a policymaker, the plaintiff bringing the municipal liability claim still must allege the existence of an

official municipal policy.  *Id.*; *see also Santiago v. Warminster Twp.*, 629 F.3d 121, 135 (3d Cir. 2010) (holding that plaintiff did not state municipal liability claim upon which relief could be granted where she failed to allege "what action [policymaker] took that could fairly be said to be policy").  Here, as noted above, the Plaintiffs' complaint did not adequately allege the existence of an official municipal policy.  Accordingly, the city is entitled to summary judgment on Plaintiffs' municipal liability claim.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part.  An appropriate order follows.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: March 23, 2020